G5kddwys

                              Sentence

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4                v.                        15 Cr. 0385(AJN)

 5   JOSEPH P. DWYER,

 6                Defendant.

 7   ------------------------------x

 8
                                           May 20, 2016
 9                                         12:05 p.m.

10
     Before:
11
                         HON. ALISON J. NATHAN,
12
                                           District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  HADASSA WAXMAN
17        BROOKE CUCINELLA
              Assistant United States Attorneys
18
     GUY OKSENHENDLER
19        Attorney for Defendant

20

21

22

23

24

25

G5kddwys
Sentence

1              THE CLERK:  U.S. v. Joseph P. Dwyer.

2              Parties, please state your name for the record,

3       starting with the government.

4              MS. WAXMAN:  Good afternoon, your Honor.  Hadassa

5       Waxman and Brooke Cucinella for the government.

6              THE COURT:  Good afternoon to you both.

7              MS. CUCINELLA:  Good afternoon.

8              MR. OKSENHENDLER:  Good afternoon, your Honor.  Guy

9       Oksenhendler for Mr. Dwyer.

10              THE COURT:  Good afternoon, Mr. Oksenhendler.

11              And good afternoon, Mr. Dwyer.

12              THE DEFENDANT:  Good afternoon.

13              THE COURT:  We're here today for sentencing in United

14       States v. Joseph Dwyer, 15 CR. 385.  In preparation for today's

15       proceeding, I have reviewed the probation report, which is

16       dated April 11, 2016.  I've also received and reviewed the

17       following additional submissions.  I have the defendant's

18       submission, dated May 13, 2016, and what has come in in

19       connection with the submission over a number of days over the

20       last week I believe adds up to a total of 41 letters from

21       family members, friends, and former colleagues.  And I have

22       reviewed those, although I did want to note, Mr. Oksenhendler,

23       there is one that I couldn't read.  There is handwriting and a

24       copy was bad and I just --

25              MR. OKSENHENDLER:  That's unfortunately, Judge, how I

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

G5kddwys
Sentence

1    received it.  Some of these things may have been scanned by

2    other people and then sent to me, and I gave it to you.  I even

3    tried to darken it once I received it and you got the very best

4    copy that I have, but the copy that I had was somewhat

5    illegible as well.

6            THE COURT:  I'll note that I think it came from Bob

7    Hall and maybe someone else.

8            MR. OKSENHENDLER:  Yes.

9            THE COURT:  So I received it but I did not review it.

10           And then I have the submission from the government,

11   which is dated March 18, 2016.

12           Is there anything else I should have in front of me

13   for purposes of sentencing?

14           MS. WAXMAN:  No, your Honor.

15           MR. OKSENHENDLER:  No, your Honor.

16           THE COURT:  OK.  And now with respect to the -- I

17   think, Mr. Oksenhendler, all of the letters are now filed on

18   ECF, is that right?

19           MR. OKSENHENDLER:  Yes, your Honor.

20           THE COURT:  And I think there was one in our

21   cross-checking that I believe didn't make it on there from

22   Anne --

23           MR. OKSENHENDLER:  Anne Hall.  You know what, I looked

24   for it.  I called the investigator to see if he had it.  I

25   could not find it.  If I find it again in my file, I promise

G5kddwys
                              Sentence

1    you I will file it on ECF.

2              THE COURT:  Well, I have it.  You submitted it to me.

3              MR. OKSENHENDLER:  I understand, but I couldn't find

4    the copy that I had.

5              THE COURT:  OK.

6              MR. OKSENHENDLER:  I believe I had sent a hardcopy --

7              THE COURT:  Oh, I see.  You sent me your only copy.

8    Well, I will docket it and file it.

9              MR. OKSENHENDLER:  Thank you, your Honor.

10             THE COURT:  Then remaining redaction issue pertained

11   to the sentencing submission.  Do you want to take that --

12   address that?

13             MR. OKSENHENDLER:  Yes, your Honor.  I would like to

14   suggest to the Court that perhaps we take that up at the end of

15   the proceeding, as I believe some of the redacted information

16   may come up during the proceeding and, therefore --

17             THE COURT:  It will answer the question.

18             MR. OKSENHENDLER:  Yes, it would moot the issue as to

19   certain things.

20             THE COURT:  OK.  All right.  We'll take it up at the

21   end.  Thank you.

22             Is there anything else, counsel, I should have in

23   front of me for purposes of sentencing?

24             MR. OKSENHENDLER:  No, your Honor.  That is all the

25   defense has to submit.

G5kddwys
                              Sentence

 1          MS. WAXMAN:  And that is all from the government, your

 2   Honor.  Thank you.

 3          THE COURT:  Thank you.  Let me just confirm now that

 4   you have fully received each other's submissions as I have just

 5   described them?

 6          MS. WAXMAN:  We have, your Honor.

 7          MR. OKSENHENDLER:  Yes, your Honor.

 8          THE COURT:  All right.  Turning to the presentence

 9   report, Mr. Oksenhendler, I know that you have, but for the

10   record have you read the presentence report and discussed it

11   with your client?

12          MR. OKSENHENDLER:  I have, your Honor.

13          THE COURT:  And I know there had been some objections

14   but it seems as though those have been worked through.  So, I

15   want to confirm -- well, I'll get to the objections in a

16   moment.  Let me just ask, Mr. Dwyer, that you did have an

17   opportunity to review the presentence report and discuss it

18   with your counsel?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  And to raise any -- an opportunity to

21   raise any errors with him, if there were any?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  All right.  Thank you.

24          And, Ms. Waxman, for the record, have you reviewed the

25   presentence report?

G5kddwys

Sentence

1          MS. WAXMAN:  I have, your Honor.

2          THE COURT:  So let me ask, then, putting aside the

3     calculation of the Sentencing Guidelines for a moment, are

4     there any objections to the report regarding factual accuracy?

5          MS. WAXMAN:  Not from the government, your Honor.

6          MR. OKSENHENDLER:  None other than was addressed by

7     probation.

8          THE COURT:  All right.  Thank you.

9          Given that, I will adopt the factual recitations set

10    forth in the PSR.  The PSR will be made a part of the record in

11    this matter placed under seal.  If an appeal is taken, counsel

12    on appeal may have access to the sealed report without further

13    application to this Court.

14          Turning to the guideline calculation.  As counsel is

15    aware, I am no longer required to follow the Sentencing

16    Guidelines but I am still required to consider the applicable

17    guidelines in imposing sentence and must, therefore, accurately

18    calculate the sentencing guideline range.  In this case there

19    was a plea agreement to which the parties stipulated to a

20    particular calculation of the Sentencing Guidelines.  And,

21    counsel, am I correct that the calculation in the PSR is in

22    accord with that agreement?

23          MS. WAXMAN:  Yes, your Honor.  That is correct.

24          MR. OKSENHENDLER:  Yes, your Honor.

25          THE COURT:  And there are no objections?

G5kddwys
Sentence

1          MR. OKSENHENDLER:  No, your Honor.

2          MS. WAXMAN:  No, your Honor, not from the government.

3          THE COURT:  Based on the parties' agreement, the

4    absence of objection and my independent evaluation of the

5    Sentencing Guidelines, I accept the guideline calculation in

6    the PSR.  Accordingly, using the November 1, 2015 Edition of

7    the Sentencing Guidelines, I do find that the offense level is

8    12, Criminal History Category is I, and that produces a

9    guideline range of 10 to 16 months' incarceration.

10          Turning to departures.  I believe your sentencing

11    submission -- your plea agreements also indicated that though

12    the parties would be free to argue for a variance, both sides

13    agreed not to seek a departure within the guidelines' system;

14    is that correct?

15          MS. WAXMAN:  Yes, your Honor.  That is correct.

16          MR. OKSENHENDLER:  Yes, your Honor.

17          THE COURT:  Nevertheless, I have considered whether

18    there is an appropriate basis for departure from the advisory

19    range within the guidelines' system and don't find grounds

20    warranting a departure.  As I have said, I am prepared to hear

21    arguments from counsel consistent with the submissions as to

22    whether a variance is appropriate.

23          Ms. Waxman, does the government wish to be heard with

24    respect to sentencing?

25          MS. WAXMAN:  Yes, your Honor, just very briefly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G5kddwys

Sentence

1          As set forth in our letter to the Court that we

2    submitted earlier this week, Mr. Dwyer's conduct had an impact

3    well beyond the defendants he was retained to assist.

4    Obtaining the names and locations of witnesses before the

5    government took the necessary precautions to protect their

6    safety and the safety of their families put real people at

7    risk.  His conduct also compromised the integrity of criminal

8    investigations and eroded the trust that the public has in us

9    and in our law enforcement partners.

10          The rules governing disclosure in criminal cases are

11    designed to protect the safety of witnesses, victims, and

12    cooperators.  They are designed to ensure the integrity of the

13    investigative process and to give folks confidence that, within

14    the appropriate legal constraints, their identities and

15    locations will be protected.  If people do not adhere to those

16    rules, the whole system falls apart.  Victims and witnesses put

17    their trust in us and take serious risks in coming forward.  If

18    we, meaning the government and our law enforcement partners,

19    cannot be trusted to keep these folks safe, victims and

20    witnesses would not come forward and serious crimes cannot be

21    prosecuted.

22          Your Honor, the government then would respectfully

23    rest on its submission and we would be happy to answer any of

24    your Honor's questions.  Thank you.

25          THE COURT:  Thank you, counsel.

                                  Sentence

1          One question.  I'm not sure if I have ever received a

2     government submission that didn't specifically argue for a

3     sentence within the guideline range, and I want to make sure

4     that I am appropriately noting the significance of that, and

5     you don't say not but you don't say yes.  So, Ms. Waxman?

6          MS. WAXMAN:  Your Honor, I would just state that, as

7     in all cases, the government believes that the guideline range

8     serves an appropriate purpose of the sentencing.

9          THE COURT:  Right.  That doesn't resolve the question.

10    But I understand it and I understand the office's policy.  I am

11    sometimes frustrated by it, but a message is sent, I think,

12    with the language chosen.  And I understood the submission here

13    to be not particularly taking issue with probation's

14    recommendation, for example, that a nonincarceratory sentence

15    would be reasonable.

16         MS. WAXMAN:  Your Honor, I think it would be fair to

17    say that the government believes that a guidelines' sentence

18    would be appropriate in this case.

19         THE COURT:  Well, then, just to put a final dot on the

20    "i," does the government believe that a nonguidelines'

21    sentencing would be insufficient?

22         MS. WAXMAN:  Your Honor, we think that a

23    nonguidelines' sentence would not serve the purposes of

24    sentencing and a guidelines' sentence would be appropriate.

25         THE COURT:  I understand.  I have said it in other

G5kddwys
Sentence

1   proceedings that I understand at some level the need for the

2   policy, but, again, I wish we were just a little more explicit

3   about what the government's position would be.  I'm left to

4   interpret it and do my best at that as a factor to consider in

5   deriving ultimately at the decision as to what the appropriate

6   sentence would be, but I'll leave it at that.

7           Mr. Oksenhendler.

8           MR. OKSENHENDLER:  Thank you, your Honor.

9           Your Honor, on January 10, 1994, a young attorney who

10   was optimistic and idealistic walked into the First Department

11   uptown and got sworn in as an attorney.  In June of '94, I

12   walked into this courthouse and became a member of the bar of

13   this court.  And around that time they were just completing our

14   new courthouse across the street, which isn't so new anymore,

15   and what always struck me about walking into the United States

16   District Court for the Southern District was that beautiful

17   sculpture of Justice when you walk into the front lobby.  And

18   there embodied in the beautiful sculpture were beliefs that I

19   held as a student and as a young lawyer and there it was

20   tangible to see in a very important place.

21           The best part about that sculpture are the scales in

22   Justice's hands which balance everything out, and that's what

23   we are all searching for.  As Ms. Waxman walks in that

24   building, I'm sure she looks at it, and I'd like to believe

25   that the day you were sworn in and walked into that courthouse,

G5kddwys
Sentence

1    perhaps you looked at that statue, too.

2            But what makes the criminal justice system fair isn't

3    just the ethics of the parties.  It is not just the jurists.

4    It's not just the prosecutors, and I find Ms. Waxman to be one

5    of the best.  It's not the ethics of defense counsel.  There

6    are other components and other variables in the equation which

7    allows all the parties that are seeking to achieve justice, to

8    do that, to reach that goal.

9            For the prosecution, they work with law enforcement.

10   They have agents, police officers, lots of resources on their

11   side.  And I've often joked with agents about the fact that the

12   prosecutors are working on their cases and with prosecutors

13   about the fact that agents work on their cases.  But on the

14   defense side, we work with people like Joe Dwyer.  He was one

15   of the guys that was one of the great equalizers, and his role

16   in what we all seek in achieving justice was so critically

17   important to the defense.  I never personally had the honor of

18   working with Joe on one of my cases, but I have spoken to many

19   colleagues who I have known for decades who hold him in the

20   highest regard for his professional work.  They are all

21   saddened, and many expressed their disappointment to me, that

22   Joe is sitting before you today.  But without any hesitation

23   I'm going to ask the Court to impose a lenient sentence in this

24   case and impose a sentence of probation.

25           One of Joe's former colleagues, an attorney who I've

G5kddwys
Sentence

1    known for many years, really hit the nail on the head in

2    describing Joe Dwyer to me when I first began my representation

3    of him.  And that was Joe -- and I think this is such a great

4    quote:  "Joe is just like Alex Rodriguez.  He didn't need to

5    cheat to make the Hall of Fame."  And when that attorney said

6    that to me, I called Joe on the phone and I'm like, Hey, I get

7    who you are.

8            Joe and I have a lot in common.  We talked about the

9    fact that, God, how many 14- to 18-hour days did you work, and

10   we began our discussion seeing how we could outdo one another

11   about how hard we would work.  We talked about the fact that

12   oftentimes we felt like we had to work until we saved the

13   world.  And I think therein lies Joe's greatest flaw.  As hard

14   as he worked and as professional as he was, as many innocent

15   people as he exonerated, as many defendants that he assisted in

16   getting a fair plea offer through his hard work, Joe made an

17   awful decision and shortcutted a very ingenious way he figured

18   out how to get documents -- and I will explain that to the

19   Court in a moment, but he crossed the line, he committed a

20   crime.  And I know for a fact, besides the fact that he has

21   pleaded and allocuted in front of this Court, but I know how

22   sorry he truly is.

23           He loved, from the very bottom of his heart, his

24   career as an investigator.  I know many people in our

25   profession, all of ours, believe deeply that the work we do

G5kddwys
Sentence

here is important for our society.  I know that you believe

your work is important.  I know I believe my work is important,

and I know Ms. Waxman's job is awfully important.  But Joe

really took his cases to heart.

What initially started as a shortcut -- if I could

just give you a little background?  Oftentimes defense

attorneys are at a disadvantage.  Those are what the rules are.

Congress writes the rules.  They certainly favor the

prosecutors in this courthouse.  And that has to do with the

timing of the disclosure of certain documents, which often

leave defense counsel in the dark as to who was involved with

their client in the commission of a crime or allegedly involved

in the commission of a crime.

And the first time that I tried a case in this

courthouse in 1995 before Judge Sprizzo, which was a three-ton

cocaine importation case, it became very apparent to me at how

difficult it was at the very last minute to get 3500 material

and catch up on all this information that the prosecution often

had for months or years.  So the defense is always at a loss,

always trying to find information.  And Joe, who is a very

bright guy, who initially began working with his brother, who

also, from what I understand, although I've never worked with

him, has an outstanding reputation as an investigator.  The two

then began to realize that, well, perhaps we could do Freedom

of Information Act requests to get information about criminal

G5kddwys
Sentence

1  investigations, that perhaps we could subpoena documents, get

2  so-ordered subpoenas to get certain documents.  And the result

3  of their ingenuity in figuring that out was the FOIA requests

4  and the subpoenas would often turn up what are called 61

5  reports generated by the NYPD and other information which they

6  would be able to get ahead of time, before the <u>Jencks</u> time.

7         Now, in this court judges routinely inform the

8  government that although they can't direct them to do it, I'd

9  like this turned over two weeks before trial, although the

10  statute says the government isn't required to turn over much of

11  the information that makes a defense possible until after a

12  witness testifies at a proceeding.  And I think these rules are

13  unfair.  But Joe worked hard to help defense counsel, and in

14  helping defense counsel, he allowed defense counsel to make or

15  to give intelligent information to their clients to help them

16  make the knowing, intelligent and voluntary decisions they have

17  to make with regard to pleading guilty or not pleading guilty

18  and whether they would testify in a particular case, how their

19  cross-examination would be conducted, thereby safeguarding the

20  constitutional rights that everybody in this courtroom is

21  concerned about.

22         I wrote in my letter I truly believe that my client

23  was a hard-working guy.  He was a zealous investigator.  He

24  became overzealous, perhaps a little lazy by finding a shortcut

25  and asking someone who he knew to get him documents that he

G5kddwys
Sentence

should not have gotten.  I blame him for that.  He was wrong to do that.

But in balancing out his wrong actions here, I'm going to ask the Court to consider the entirety of who Joe Dwyer is. The government said in its sentencing submission that my client committed these acts for financial gain and that's why he did this, to increase his practice, to have more clients.  And as much as I respect Ms. Waxman and her opinion, I believe that the argument is specious.  My client did not commit this crime for financial gain.  There is a very simple way for us to determine if he did so.

If my client was hired by attorneys who were aware that he was able to get these documents off the law enforcement database and they knowingly told him, Joe, I'm hiring you because I know you have a guy who can get these documents, Mr. Buell would not be the only codefendant in this case.  If there were attorneys that knowingly conspired with Mr. Dwyer to commit the offense for which he has allocuted to in this case, there would be defendants in this case who were members of the bar of the State of New York and were members of the bar of the Southern District.

In this case I have not seen one allegation against one of my colleagues, who I all hold in very high regard, nor do I know of any discipline taken against any colleague for the use of those documents.  So the fact that the government has

G5kddwys
Sentence

1    argued to you that attorneys hired him because they knew he

2    could get these documents, I don't believe that argument holds

3    any weight.  If attorneys knew that he could get these --

4         THE COURT:  You are saying that that is inherent in

5    the argument that he did this for financial gain, or are you

6    saying that explicit contention?

7         MR. OKSENHENDLER:  I believe that goes to the

8    financial gain.  He didn't -- he didn't -- he worked hard but

9    he wasn't hired more often because he could get these

10   documents.  There were lots and lots of cases that he's worked

11   on, probably over a thousand, that had nothing to do with these

12   documents.  The number of cases that are involved in this case,

13   by my estimation, is around 20 cases.  He's handled over a

14   thousand if not closer to two in his -- 2,000 in his 20-year

15   career as an investigator.

16        Now, the government claimed in their letter that

17   between 2011 and 2014 Mr. Dwyer had an income of $500,000 from

18   CJA, and I would like you to look at that number, that figure,

19   in this way.  Investigators on average are paid a little less

20   than $100 an hour for their services to the court and to the

21   defense bar.  It is usually 90 or 95.  But if I use a hundred

22   as a round number, for the four years between 2011 and 2014,

23   that would be about 5,000 hours worth of work billed to CJA.

24   If you divide the 5,000 hours by the four years, you're talking

25   about 1250 hours a year that he worked on CJA cases, which

Sentence

1    would be about $125,000 a year, which, while by anybody's

2    standard is a terrific income, it is not unreasonable for a

3    hard-working professional such as an investigator to make that

4    type of money in that time span.  He did not make an inordinate

5    amount of money for the professional that he was in the time

6    that the government described to the Court.

7         They said that his ability to get these documents had

8    him so busy that he was able to -- he had to hire other people,

9    and that argument also has to fail.  When Mr. Dwyer went out on

10   his own and began his own investigation company, he had someone

11   working I would say it would be similar to an "of counsel"

12   relationship with this other individual, and that guy started

13   working with him in 2006.  Over the years, there were two or

14   three other part-time people that worked for very, very short

15   periods of time.  So between 2006 and the end of 2014, there

16   were only three people who worked -- one person worked, from

17   what I understand, two months, and then two other individuals

18   worked five or six months for him in that 10-year span.  There

19   was one other person that primarily worked with Joe in his

20   practice over that 10-year period.

21        And this business, this extraordinary business that he

22   was able to get because of what the government claims was his

23   wrongdoing, did not necessitate him having to hire lots of

24   other people in his business.  He had someone like an associate

25   that worked with him the whole time, and then over the course

G5kddwys
Sentence

1    of the 10 years there were three other people who for a very

2    short period of time worked with him.

3             I'd like to point out page 19 of the final presentence

4    report.  There was an objection that we made as to paragraphs

5    14 and 15, that they be omitted from the report that your Honor

6    just made part of the record.  At no point did my client bill

7    the Criminal Justice Act and pay Mr. Buell with money that he

8    billed the Criminal Justice Act.  The very last sentence of

9    page 19 says, "After conferring with the government, the

10   above-noted information has been omitted from 14 and 15," and

11   that was with regard to payments from CJA funds.  There should

12   be no consideration that my client used CJA funds to pay

13   Mr. Buell.  It was out of his own pocket.

14            In this case, just to show the character of my client,

15   my client had a proffer with the government.  From what I

16   understand, there was tremendous concern, rightly so, by the

17   prosecutors in this case as to the breadth of wrongdoing by

18   anyone who was a member of law enforcement.  In that proffer,

19   my client described what had gone on, including his own

20   criminal liability, and from what I understand, although I

21   wasn't his attorney at the time, he was completely truthful in

22   that proffer.  In that proffer he described the attorneys that

23   he worked with, and this leads me to my thought on disparity in

24   this case.

25            For whatever reasons, although they are beyond my pay

Sentence

rate, the U.S. Attorney's Office has found that there was no

wrongdoing by any defense counsel.  It's not for me to comment

on who they prosecute and why they prosecute.  All I know is

that as we stand here today -- as I stand here today in this

courthouse, there are no colleagues of mine that are charged

with wrongdoing.  I do know, unfortunately, that my colleagues,

some of them, used documents that Joe was able to get, yet they

were not charged with any offense.  And so in considering

disparity of sentences, I would ask that you consider that no

one else was charged with any offense here, besides Mr. Buell,

that had worked with Joe on these cases, and I suggested to the

Court there were about 20.

        I'd like to bring to the Court's attention my

sentencing submission with regard to medical issues as a

consideration.  I won't touch on anything more about that.

        In the gallery here today is his wife, his sister, his

niece, his brother.  There are other family members that would

like to come but weren't able to make it.  I would just suggest

that he's very, very fortunate that he has the love of his

family.

        Again, to talk about his character and the respect for

justice that he has, I'd like to bring up the case -- it is a

New York State Supreme Court case currently pending in the

Bronx County -- People v. Garry, G-a-r-r-y.  And this case,

your Honor, not only shows his deep concern about doing

G5kddwys
Sentence

1   justice, but it also shows the tremendous respect that Joseph

2   Dwyer, the son of a police sergeant, has for law enforcement.

3           The Gary case involves the murder of a retired police

4   detective, Oswald Potter.  An individual, the defendant, last

5   name Gary, was convicted of the offense.  He had three

6   accomplices in the offense.  All of them ultimately, from what

7   I understand, were arrested here in the Southern District for

8   criminal offenses.  They all pleaded guilty for the Oswald

9   Potter murder.  And one of them, Mr. Broussard, became a

10  Southern District informant.

11          Some years later, defendant Gary filed a

12  post-conviction motion in the Bronx Supreme Court, saying that

13  he was wrongly convicted, that he was an innocent man, and that

14  he should not continue having to serve a sentence for a crime

15  that he didn't commit.

16          Mr. Dwyer became involved in the motion for Mr. Gary

17  to exonerate him of this crime that Mr. Gary claimed he was

18  wrongly convicted of.  Joe's greatest asset as an investigator

19  was his ability to speak to anybody, get people to talk to him.

20  And ultimately he got to speak to Mr. Broussard, the S.D.N.Y.

21  informant, and pursuant to law, Mr. Dwyer was able to record

22  the conversation that he had with him.

23          Now, Mr. Broussard, in 2008 and in 2014 had identified

24  in a photo array two other individuals that were responsible

25  for Oswald Potter's death, or Detective Potter's death,

Sentence

clearing his friend Mr. Gary, kind of throwing him a bone.

Mr. Dwyer went to speak to Mr. Broussard. And in the conversation, to Mr. Dwyer's surprise, Mr. Broussard admitted that in fact Mr. Gary was the shooter and did murder Detective Oswald Potter. Broussard had already been testifying in a Bronx Supreme Court proceeding that he wasn't -- that Gary wasn't the shooter. At some point later -- and I should note that Mr. Dwyer had interviewed Mr. Broussard two years before he testified at the hearing. At some point the tape that Mr. Dwyer made was given to defense counsel on that case, who was handling the exoneration motion, the post-conviction motion, but -- and I still don't understand why -- that tape wasn't turned over to the Bronx District Attorney's office. After Mr. Dwyer was arrested, the tape made its way to the Bronx District Attorney's office, because Mr. Dwyer, although concerned about justice being done where an innocent man should not remain in jail, wanted to make sure that a cop killer wasn't wrongly released.

And so the Bronx District Attorney's office, with an opportunity to listen to that tape, spoke to Mr. Dwyer. He testified at a hearing, knowing that Mr. Broussard was an informant of the Southern District and that there could be some kind of consequence to doing what he did. He felt that justice required that he do the right thing.

So any argument that my client wasn't interested in

G5kddwys
Sentence

justice, he made sure, to the extent that he could, that

someone that killed one of the princes of this city is held

responsible for taking that prince's life.

     The government -- I am getting close, Judge.  The

government said that criminal investigations, prosecutions

could have been jeopardized, but in this case none of the

information jeopardized a prosecution or investigation.  They

said witnesses could have been intimidated.  They could have

been but they weren't.  There could have been witness

tampering, but there wasn't.  And evidence could have been

destroyed, but it wasn't.  There were no claims that Mr. Dwyer

used any of the wrongful information that he acquired for a

nefarious purpose.  No one was threatened.  No one was

intimidated.  No evidence was destroyed.  No one was hurt.

There was no retaliation.

     The information that he gave to the lawyers was used

for the lawyers to help their clients make important decisions

in this courthouse.

     He did a lot of good things in his life.  He has four

beautiful kids and a beautiful wife.  He threw away a 20-year

career working with the very, very best of the criminal defense

bar in this city.  He worked with people on the Capital Defense

Panel.  He worked with the Innocence Project and the

Exoneration Initiative.  There are a lot of good things to be

proud of Joe Dwyer.  It is an honor to represent him.  He made

G5kddwys
Sentence

1    a terrible mistake.  I'm very glad I can stand here and say no

2    one was hurt because of his stupidity.  But because of his hard

3    work and his initiative, I'm very proud to stand here and say

4    there are a lot of people who were wrongly convicted and

5    exonerated through his efforts.

6          So in balancing all the equities in this case, your

7    Honor, I would ask that you impose a sentence of probation.

8          THE COURT:  Thank you, Mr. Oksenhendler.

9          MS. WAXMAN:  Your Honor.

10         THE COURT:  Yes.

11         MS. WAXMAN:  Just a couple of things.

12         First, at some point the government is going to ask

13   for just a very brief adjournment of a couple of moments,

14   because I think that some of the comments made on the

15   Mr. Broussard matter were not accurate.  We would like to

16   consult with a couple of people in our office so that we can

17   respond to the Court in a meaningful way.

18         But just very briefly, your Honor, first I would like

19   to address some of the points that Mr. Oksenhendler made.

20         MR. OKSENHENDLER:  Can we just hold on one second?

21         (Handing a document to Ms. Waxman)

22         MS. WAXMAN:  Your Honor, if I may briefly just address

23   a few of the points that counsel made?

24         THE COURT:  Go ahead.

25         MS. WAXMAN:  The first is that Dwyer was a very

                                    Sentence

1   sought-after investigator because he was the best, and the

2   reason he was the best is because he could get his hands on

3   things that other investigators could not get their hands on

4   and he did that by breaking the rules.  The rules are the

5   rules, and they are designed to strike a very delicate balance

6   between the defendant's rights and the legitimate rights of

7   criminal victims and witnesses to preserve their very lives.

8   Witnesses, especially in crimes of violence, where Mr. Dwyer

9   was retained are very afraid to come forward and only do so

10  because they believe that we can protect them, and here

11  Mr. Dwyer put that whole process in grave danger and, as a

12  result, victims and witnesses, whose rights deserve to be

13  vindicated in a criminal prosecution, are afraid to come

14  forward and the system will continue to fall apart.

15          THE COURT:  Ms. Waxman, just to press.  So, the

16  government makes an argument as to motivation, that --

17          MS. WAXMAN:  Yes.

18          THE COURT:  -- Mr. Dwyer wars motivated by financial

19  gain.  Mr. Oksenhendler, it's a little bit complicated but the

20  point I think being made is the premise of that is that defense

21  lawyers had to know he could get this material, therefore he

22  was hired and therefore got more jobs because they knew they

23  could get this material.  If that were true, premise number

24  two, then there would be defense counsel codefendants here.

25          Is that the government's financial gain argument, and

G5kddwys
Sentence

1  are those premises necessary to the conclusion that at some

2  level he was motivated by financial gain?

3      MS. WAXMAN:  Your Honor, I don't think that the

4  involvement or the knowledge of defense lawyers is at all

5  necessary to our argument.  The argument is that, as he

6  considers himself, Joe was known as the best, he could get

7  stuff, and defense lawyers hired him because he was the best at

8  his job.

9      Now, let me just say one thing on this argument,

10  Mr. Dwyer's argument that he was somehow singled out or that

11  the lawyers who retained Mr. Dwyer were not charged.  First, as

12  an initial matter, your Honor -- and we feel very strongly

13  about this -- this sentencing proceeding is about Mr. Dwyer, it

14  is not about anything else, it is about Mr. Dwyer.  And

15  Mr. Dwyer's conduct here, which is extremely serious and put

16  the system at risk, has to be evaluated.

17      Second of all, it would obviously not be appropriate

18  for us to comment on the nature of our investigation or what we

19  did about the lawyers, but what I can assure the Court and I

20  can assure the public, that the government investigated this

21  case very, very seriously and very, very vigorously, and we

22  brought the charges that the evidence supported and we feel

23  very comfortable with that and very confident on that.

24      Your Honor, as to Mr. Oksenhendler's statement that he

25  said Dwyer did not use CJA funds to pay Mr. Buell, let me say

G5kddwys
Sentence

 1  this:  That CJA billings were the vast majority of Mr. Dwyer's

 2  income for the period charged in the indictment and in the

 3  information.  Whether or not the funds were paid directly from

 4  CJA or Mr. Buell or whether they were paid indirectly is not

 5  really relevant.  The fact is that Mr. Dwyer made his money

 6  from CJA billings, and then, in turn, Mr. Dwyer paid Mr. Buell

 7  thousands of dollars in exchange for obtaining information --

 8  private, privileged, confidential information that he was not

 9  otherwise entitled to.

10          THE COURT:  I mean, the point is he didn't submit a

11  bill with a line item $500 expenses that was then reimbursed.

12  Your point is that most -- yes, it came out of his pocket.

13  Most of what went into his pocket was CJA money.

14          MS. WAXMAN:  Exactly.  His pocket was lined with CJA

15  money and that part of that money went out to pay Mr. Buell in

16  connection with this conduct.  That is my point there.

17          THE COURT:  Right.

18          MS. WAXMAN:  Your Honor, if I can just ask for a brief

19  adjournment on that one issue so that we can consult, I would

20  appreciate it.  I will be no more than five minutes.

21          THE COURT:  All right.

22          THE CLERK:  All rise.

23          (Recess)

24          THE COURT:  Ms. Waxman.

25          MS. WAXMAN:  Yes.  Thank you, your Honor, and thank

G5kddwys
                              Sentence

1    you for the brief adjournment.

2              So on the Broussard issue, your Honor, we would just

3    like to note that the representations that were made on the

4    Broussard tape we don't believe are entirely accurate, but it

5    is not something the government would like to get into here nor

6    can we get into it here because it's a matter of an ongoing

7    state proceeding in the Bronx, and we wouldn't want to

8    jeopardize that proceeding.

9              THE COURT:  I don't need to decide who committed that

10   murder to sentence Mr. Dwyer.

11             MS. WAXMAN:  Thank you, your Honor.

12             THE COURT:  Let me just -- the point Mr. Oksenhendler

13   is making, I think if we step back a little bit, is that

14   consistent with the portrait he's painting of Mr. Dwyer as

15   someone who cares about justice and was willing to take some

16   level of risk in coming forward in that case and that I should

17   consider that in my sentencing conclusion.  Do you disagree

18   with that?

19             MS. WAXMAN:  Your Honor, I would like to note, though,

20   the timing of Mr. Dwyer's disclosure.  That disclosure was made

21   in the Broussard case after he was charged here by the federal

22   government and after he was arrested.  So I think that your

23   Honor should also, when considering his actions on Broussard,

24   should also take into account the timing of that disclosure.

25             THE COURT:  So, in other words, I should look at the

G5kddwys
Sentence

1    nobility of it with some skepticism out of concern that it was

2    done in part to make the argument being made here, is that

3    the --

4              MS. WAXMAN:  Frankly, yes, your Honor, that would be

5    our position, yes.

6              Your Honor, just to say that, again, I said this but I

7    just want to reiterate, that all of that argument on Broussard,

8    it does not have anything to do with what Mr. Dwyer did here,

9    which is looking up witnesses, looking up the names of victims,

10   disclosing them to the defense team in a way that put people at

11   risk, real human beings at risk, that made our job harder, that

12   made the prosecution of violent criminals harder, and he did so

13   by bribing a member of the NYPD.

14             Now, your Honor, I would like to go back to a --

15             (Mr. Oksenhendler rose)

16             THE COURT:  You will have a chance, Mr. Oksenhendler.

17             MR. OKSENHENDLER:  Yes.

18             MS. WAXMAN:  I would like to go back to a question

19   that your Honor asked earlier in the proceeding.  In light of

20   your Honor's comments, I would just like to make it very, very

21   clear that it is our view Mr. Dwyer is not above the law.  As I

22   noted, he put real people at risk, and he deserves a serious

23   punishment.  He does not deserve a slap on the wrist.  And I

24   would say, your Honor that probation's recommendation would not

25   be appropriate in this case given the conduct, given the

G5kddwys
Sentence

1    seriousness of it, and given the fact that he undermined the

2    judicial system as we know it.

3              THE COURT:  All right.  Mr. Oksenhendler.

4              MR. OKSENHENDLER:  Just very briefly, Judge.

5              The timing of the matters in Broussard, as far as I

6    understand them, had nothing to do with me coming in here and

7    making this argument.  I think, despite his error on the 20

8    cases that brought him before you, what he did in Broussard is

9    evidence of what he did on the other 1,980 cases that he

10   handled.  He worked at a very high level, very long hours, and

11   in a very affable way got people to make true statements to

12   him, which helped courts, juries, prosecutors and defendants

13   make intelligent decisions.

14             The government had the same opportunity, if not more,

15   than I had to give input to probation to formulate the

16   presentence report in this case, and I believe that the

17   recommendation of the United States Probation Office in this

18   case is well worth it.

19             THE COURT:  All right.  Anything else, counsel?

20             Mr. Dwyer, you are not obligated to make a statement

21   to me but if you would like to do so, sir, you may do that now.

22             I just ask you, sir, to pull up the microphone and

23   keep your voice up and take your time.

24             THE DEFENDANT:  Your Honor, I take full responsibility

25   for my conduct.  I have -- I prepared something.  I am just

Sentence

1   going to kind of read it.

2                THE COURT:  That is fine.

3                THE DEFENDANT:  I take full responsibility for my

4   conduct that brings me here before you today.  I am very sorry

5   for my actions.

6                When I became a police officer at the age of 20, my

7   goal was to become a first grade homicide detective.  My father

8   was a Suffolk County Police Sergeant for 30 years, and there

9   was a long line of law enforcement in the Dwyer family.  Things

10  didn't go my way, and after breaking two bones in my neck while

11  making an arrest, my career was over in a flash at the age of

12  25.  It was, to say the least, very disheartening.

13                The funny thing is, or I should say the ironic thing

14  is a few years later, without even realizing it, I became a

15  homicide detective.  It wasn't quite the way I had planned

16  things out, but, nonetheless, over a span of 20 years, I was

17  investigating murders, lots and lots of murders, but as you

18  know, it was not my job to solve the murder.  I never had the

19  luxury to do crime scenes, to interview live witnesses, to

20  obtain vital records.  Most often, I became involved sometimes

21  five, 10, 20 years after the crime had been committed.  I was,

22  after all, a criminal defense investigator, and I proudly

23  worked for attorneys who in many instances represented indigent

24  minority defendants charged with death-eligible offenses.  No

25  matter if it were a petit larceny or a grisly double homicide,

Sentence

1    I did the very, very best I could on every single case that I

2    had the privilege to work on.

3         Your Honor, in short, I became too engaged and

4    overwhelmed in trying provide a zealous defense for my clients.

5    Some said, including especially my wife, I became obsessed.

6    There was never any ulterior motive.  I worked tirelessly and I

7    tried to be the best investigator I could.  In doing so, I used

8    poor judgment and I made a terrible mistake.

9         It's been quite an ordeal for my wife and children

10   over the last few years.  As for my three teenage daughters and

11   my son -- he turns 13 on Monday -- I can only say they are my

12   life.  They are the air that I breathe.  The very big mistake I

13   made which brings me here has caused enormous devastation and

14   pain.  I am doing everything in my power to find a way to help

15   my family survive and move forward.  I am very sorry to them,

16   to the Court for all that has occurred.

17        I would just like to tell you that I was devastated

18   when the government's sentencing memorandum was filed

19   Wednesday, as was my family and everyone that knows me.  It was

20   the first time in 17 months, with two attorneys, that I had

21   ever heard a motive about money.  And I stand before you today,

22   your Honor, accepting responsibility.  I made a stupid mistake.

23   This had nothing to do with not one dollar.  In fact, I used my

24   own money, stupidly, to try to get reports to help the cases

25   along, to try to find the truth.

Sentence

1          And the fact of the matter is those are just words on

2     a paper.  I know this isn't an evidentiary hearing, but when

3     the government writes things such as "$500,000," I work a

4     tremendous amount of hours 24/7.  I did actually close to 4,000

5     cases, and I had a full-time retired NYPD detective who was my

6     employee with me from 2006.  And from 2006, when I went on my

7     own in this business, after starting in 1995, from 2006 through

8     2010, before Mr. Buell ever came into the picture, I had

9     decade-long relationships with the top level of attorneys in

10    the Eastern and Southern District, that I had worked for them

11    for over 10 years, some 15, some close to 20, and the idea that

12    because I could illegally and stupidedly -- with stupidity

13    obtain a police report somehow encouraged them to hire me is

14    false and that's -- I would hope in deciding a sentence you

15    will take all of this into consideration.  And one other thing.

16    And when that memorandum was filed, it's the first time I ever

17    heard of that motive.  That's inconsistent with the PSR.  I was

18    devastated.

19          I would hope that in deciding a sentence, you will

20    truly understand how sorry I am for making that terrible

21    decision and violating the law, but I would hope that you would

22    take my life into consideration as a whole and never make me

23    miss one day of my beautiful children's life.

24          Thank you.

25          THE COURT:  Thank you, Mr. Dwyer.

G5kddwys
Sentence

1         Just for confirmation of the record, Mr. Oksenhendler,

2    there is not a request for any kind of factual hearing on this

3    issue, is there?

4         MR. OKSENHENDLER:  No, your Honor, not at all.

5         THE COURT:  OK.  All right.

6         Anything else?

7         MR. OKSENHENDLER:  Thank you for listening.

8         THE COURT:  All right.  You may be seated.

9         THE DEFENDANT:  Thank you, your Honor.

10        THE COURT:  Ms. Waxman.

11        MS. WAXMAN:  The government has nothing else.

12        THE COURT:  All right.  Thank you.

13        Counsel, I assume, then, that there is no reason why

14   sentence should not be imposed at this time?

15        MS. WAXMAN:  No, your Honor.

16        MR. OKSENHENDLER:  No, you your Honor.

17        THE COURT:  As I have stated, the guideline range

18   applicable to this case is 10 to 16 months' imprisonment.

19   Under the Supreme Court's decision in Booker and its progeny,

20   the guideline range is only one factor the Court must consider

21   in deciding the appropriate sentence.  I'm also required to

22   consider the other factors set forth in 18 U.S.C., Section

23   3553(a), and these include the nature and circumstances of the

24   offense, the history and characteristics of the defendant, the

25   need for the sentence imposed to reflect the seriousness of the

G5kddwys

Sentence

offense, to promote respect for the law, to provide just

punishment for the offense, to afford adequate deterrence to

criminal conduct, to protect the public from further crimes of

the defendant, and to provide the defendant with needed

education or vocational training, medical care or other

treatment.  I am to take into account the kinds of sentences

available, as I said, the guideline range and any pertinent

policy statement, and the need to avoid unwarranted sentence

disparities and the need to provide restitution to any victims

of the offense.  I am required to impose a sentence sufficient

but no greater than necessary to comply with the purposes I've

just described.

        I have given substantial thought and attention to the

appropriate sentence in this case in light of the 3553(a)

factors and the appropriate purposes of sentencing as reflected

in the statute.

        I'm not going to hide the ball here.  I'm not sending

you to prison.

        (Spectators reacted)

        THE COURT:  Order.  There will be no further

disruptions -- no further disruptions -- or I will have to ask

you to leave.

        I'm not sending you to prison for this crime,

Mr. Dwyer, and I'm not doing so for the following reasons.

First, this is your first offenses and I do have confidence

G5kddwys
Sentence

1   that you will not again engage in this kind of illegal conduct.

2   Second, you pled guilty and you have accepted responsibility

3   for your criminal wrongdoing.  Third, you have and you will

4   continue to suffer the very real and very serious consequences

5   of your action.  You've jeopardized your livelihood, damaged

6   your reputation, embarrassed yourself and your family, and you

7   will have to continue to live under the restrictions and

8   supervision of the Probation Department and the consequences of

9   being a convicted felon.  Fourth, as many of the letters I

10  received convinced me, you are a hard-working, dedicated, and

11  honorable family man with a history of public service both

12  through your time on the police force and your work as an

13  investigator in criminal matters before this and other courts.

14  For these reasons, I agree with the recommendation of the

15  Probation Department that a sentence of probation is sufficient

16  to meet the relevant goals of punishment, including deterrence

17  and just punishment.

18          That I'm not requiring you to serve time in prison,

19  Mr. Dwyer, does not mean that I think what you did is not

20  serious and deeply damaging to our system.  It was.  You

21  crossed the line, and you did so for reasons that I believe

22  involved both at some general level a desire for financial gain

23  and for zealous investigation and advocacy on behalf of your

24  indigent clients.  But either way, you crossed the line.  You

25  broke the law.  You decided you knew better than, for example,

Sentence

Congress, which put the discovery rules in place.  You decided

you knew better than law enforcement, which protects private

information of citizens that it keeps in its databases by

restricting access to law enforcement officers.  You decided

you knew better than the U.S. Attorney's Office, which

carefully considers safety precautions that must be in place in

advance of witness disclosure.  And you decided you knew better

than courts, judges like me, who enforce the rules and

procedures upon which our criminal justice system and the rule

of law are built.  Whatever may have motivated you to do what

you did, you decided the rules should not apply to you or your

clients, and you crossed the line and you broke the law, and in

doing so you could have and maybe did put individuals in

danger, but you certainly participated in the corruption and

corroding of our system.

        I sincerely hope and expect that the fact of your

prosecution and the consequences you are suffering and will

suffer as a result will serve to deter others from making

similar wrong, dangerous, and criminal choices.

        But as I said, Mr. Dwyer, I am not incarcerating you.

I do believe that we are all more than the worst mistakes that

we make.  I believe your history and characteristics, as

described by your family members, friends and colleagues,

including many members of the bar that practice before me,

demonstrates that an incarceratory sentence is unnecessary to

G5kddwys
Sentence

1   meet the goals of punishment that I have described.

2          I'll now formally state the sentence I intend to

3   impose.  Mr. Dwyer, will you please rise.

4          It is the judgment of this Court that you are

5   sentenced to a five-year term of probation.

6          You may be seated.

7          During your term of probation, the following

8   restrictions apply:  You will be subject to the standard

9   conditions of supervision and, in addition, the following

10  mandatory conditions.  You shall not commit another federal,

11  state, or local crime.  You shall not illegally possess a

12  controlled substance.  You shall not possess a firearm or

13  destructive device.

14         I will suspend the mandatory drug testing condition

15  based on my determination that you pose a low risk of future

16  substance abuse.

17         You shall cooperates in the collection of DNA as

18  directed by the probation officer.

19         In addition, you will be subject to the following

20  special conditions:  You shall provide the probation officer

21  with access to any requested financial information.

22         You are to report to the nearest Probation Office

23  within 72 hours.

24         I do recommend that you be supervised in your district

25  of residence.

G5kddwys
Sentence

1          I'm waiving the fine because I don't believe you have

2     the ability to pay the fine.

3          I am imposing a mandatory special assessment of $100,

4     which shall be due immediately.

5          Is there anything to address regarding forfeiture or

6     restitution?

7          MS. WAXMAN:  No, your Honor.

8          THE COURT:  Does either counsel know of any legal

9     reason why the sentence shall not be imposed as stated?

10         MS. WAXMAN:  I do not, your Honor.

11         MR. OKSENHENDLER:  No, your Honor.

12         THE COURT:  Sentence as stated is imposed.  I do find

13    that the sentence is sufficient but not greater than necessary

14    to satisfy the sentencing purposes I described earlier.

15         Mr. Dwyer, I know you know this but you must of course

16    comply strictly with all of the terms of supervision that you

17    will be under by the Probation Department and you must comply

18    strictly with those conditions.  If you are brought back before

19    me for any violation of those conditions, I may sentence you to

20    a term of imprisonment, and I hope and expect that you won't

21    put me to that decision.

22         Ms. Waxman, are there any remaining counts or

23    underlying indictments that need to be dismissed at this time?

24         MS. WAXMAN:  There are none, your Honor.

25         THE COURT:  Mr. Dwyer, I see no basis for an appeal,

G5kddwys
Sentence

 1   but I am required to inform you of your appellate rights.  To

 2   the extent that you have not given up your right to appeal your

 3   conviction and sentence through your plea of guilty and the

 4   agreement that you entered into with the government in

 5   connection with that plea, you have the right to appeal.  If

 6   you are unable to pay the cost of an appeal, you may apply for

 7   leave to appeal in forma pauperis, that is to say, without

 8   payment.  Notice of Appeal must be filed within 14 days of the

 9   judgment of conviction.

10        Counsel, is there anything else I can address at this

11   time?

12        MR. OKSENHENDLER:  Yes, Judge.  We have the

13   outstanding redaction.

14        THE COURT:  Yes.

15        MR. OKSENHENDLER:  I believe the redaction that I made

16   with regard to his proffer is no longer necessary.

17        THE COURT:  Great.

18        MR. OKSENHENDLER:  So I would be happy to post my

19   sentencing submission including that paragraph.

20        With regard to the other redactions, I believe they

21   are appropriate under the S.D.N.Y. guidelines for redactions

22   which regard to family, medical, personal information and would

23   ask that those redactions simply stand.

24        THE COURT:  I think there is overredaction in that

25   regard.  I think some of the very specific medical issues could

G5kddwys
                              Sentence

1    appropriately be redacted, so I will ask you to resubmit with

2    the unredactions as we've discussed, and you can propose some

3    specific redactions to the specific medical records.

4    Otherwise, I think it goes beyond what's authorized.

5              MR. OKSENHENDLER:  Yes, Judge.  No problem.

6              THE COURT:  Anything else, Mr. Oksenhendler?

7              MR. OKSENHENDLER:  No, your Honor.

8              THE COURT:  Ms. Waxman?

9              MS. WAXMAN:  No, your Honor.

10             THE COURT:  I thank both counsel for their advocacy

11   here.

12             We are adjourned.

13             THE CLERK:  All rise.

14

15                              -   -   -

16

17

18

19

20

21

22

23

24

25